ELECTRONICALLY FILED
Pulaski County Circuit Court
Terri Hollingsworth, Circuit/County Clerk
2019-Aug-06 11:36:18
60CV-19-5579
C06D16 : 19 Pages

## IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS

_16ᵗʰ_ DIVISION

IIC MANAGEMENT COMPANY, LTD.                    PLAINTIFF

v.                    CASE NO. _60 CV-19-5579_

UTAH CORD BANK, INC.                    DEFENDANT

### COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Comes IIC Management Company, Ltd. ("IIC"), and for its cause of action against Utah Cord Bank, Inc. ("UCB"), states:

### Parties, Jurisdiction, and Venue

1.    IIC is a legal entity organized under the laws of the sovereign nation of Antigua and Barbuda. IIC has its principal place of business in St. John's, Antigua. IIC also from time to time has conducted business and performed activities within the State of Arkansas, including certain interactions with, and actions involving, UCB.

2.    UCB, upon information and belief, is a business corporation organized under the laws of the State of Utah. UCB has engaged in such activities and has undertaken certain actions in the State of Arkansas and related to the State of Arkansas so as to subject itself to the jurisdiction of the courts of the State of Arkansas. UCB's agent for service of process is Dr. Eliott Spencer, 23 Sunwood Lane, Sandy, Utah 84092. UCB's business address as on file with the Utah Department of Corporations is 8675 South Sandy Parkway, Sandy, Utah 84070.

-1-

3.      Significant actions and interactions involving UCB and IIC occurred in Little Rock, Pulaski County, Arkansas, including certain specific actions and interactions which occurred in Little Rock, Pulaski County, Arkansas which ultimately led to the formation of the contract between IIC and UCB which is the subject matter of this litigation.

4.      This court has jurisdiction over the subject matter of this action and the parties hereto. Venue is proper in this court.

### Factual Background of Dispute

5.      IIC realleges and incorporates herein by reference all allegations set forth in Paragraphs 1 through 4 above.

6.      IIC is a medical services provider which owns and operates a clinical treatment center in St. John's, Antigua, which also includes the operation of a stem cell treatment center (the "**Center**"). The Center was established by IIC and opened earlier this year. IIC is duly authorized, and holds all licenses and permits necessary, to conduct its business and perform its services in accordance with the laws of Antigua and Barbuda.

7.      At IIC's Center in St. John's, Antigua, IIC performs certain complex and technologically advanced medical procedures including certain procedures involving the implantation of stem cells into its human patients for certain medically-recognized purposes. Treatment involving stem cell products is a rapidly evolving field of medical treatment which holds great promise to address a number of medical and healthcare concerns.[1] The operation of a stem cell treatment center also is a desirable and profitable business.

---

[1] There are numerous scholarly publications and general information websites that discuss treatment involving stem cell products. For example, a good summary from the Mayo Clinic is found at the following web address: https://www.mayoclinic.org/tests-procedures/bone-marrow-transplant/in-depth/stem-cells/art-20048117.

8.    In connection with its clinical operations and specifically in connection with the establishment and opening of the Center, IIC was seeking a source for certain stem cell products to be used in the medical treatments of its patients at the Center, including implantable stem cell products.

9.    UCB has developed for sale two stem cell products called StemVive and Stemii (collectively, the "**Stem Cell Products**").

10.    In early 2019, IIC and UCB began discussions about IIC's potential use of UCB's Stem Cell Products for stem cell treatments at IIC's Center.  These discussions included the possibility of UCB becoming IIC's primary supplier of stem cell products.

11.    Before committing to a contractual relationship with UCB, it was essential to IIC that IIC be able to verify the quality of UCB's Stem Cell Products and also the suitability of UCB's Stem Cell Products for IIC's specific treatment uses.  Thus, as a condition for continued negotiations, IIC required UCB to make available samples of its Stem Cell Products for review by IIC's medical and technical personnel.

12.    Specifically, the Chairman of IIC (the "**IIC Chairman**") is a resident of Little Rock, Pulaski County, Arkansas, and has his principal place of business in Little Rock, Pulaski County, Arkansas.  The IIC Chairman has extensive medical training and experience as a practicing physician.  Because of this background of education and experience, and in addition to being IIC's Chairman, the IIC Chairman also provides medical and technical advice and guidance to IIC.

13.    In March 2019, at the request of IIC, UCB sent samples of its Stem Cell Products to the IIC Chairman in Little Rock, Arkansas for review, testing, and other appropriate analysis by the IIC Chairman in order to determine whether the UCB Stem Cell Products were of a quality and

character suitable for use by IIC in its clinical operations. The IIC Chairman conducted his review of these samples from UCB and the other related activities in Little Rock, Arkansas.

14.     The IIC Chairman also had a number of telephone and email conversations with UCB representatives about the UCB Stem Cell Products. Most, if not all, of the IIC Chairman's communications with UCB and its representatives originated from the State of Arkansas.

15.     In connection with these preliminary discussions and the product review by the IIC Chairman, representatives of UCB also agreed to come to Arkansas to meet with the IIC Chairman to provide additional information, and an Arkansas meeting was scheduled. Ultimately, the in-person meeting was deemed not necessary by IIC and was canceled.

16.     After IIC completed its product review in Arkansas and determined that the UCB Stem Cell Products were suitable based upon the tested samples, the parties engaged in negotiations with the purpose of negotiating and executing a supply contract between IIC and UCB for Stem Cell Products. In the absence of a successful review of the UCB Stem Cell Products by IIC during the Arkansas review and analysis, IIC would not have continued negotiations with UCB and would not have entered into a contract with UCB.

17.     As a result of these review activities by IIC and the parties' negotiations, on or about April 17, 2019, IIC and UCB entered into a Supply Contract (the "**Supply Contract**"). The Supply Contract was executed by IIC in Little Rock, Arkansas by the IIC Chairman and by UCB by Dr. Eliott Spencer in Utah. The Supply Contract, *inter alia*, contains certain representations and warranties, including certain mandatory specifications and requirements applicable to each shipment of Stem Cell Products. A true and correct copy of the Supply Contract is attached hereto and incorporated herein as **Exhibit A.**

-4-

18.    Pursuant to Sections 1 and 2 of the Supply Contract, on or about May 17, 2019, ICC ordered 100 cc of stem cells from UCB for the purchase price of $25,000. This $25,000 purchase price has been fully paid by IIC to UCB.

19.    The Stem Cell Products ordered by IIC from UCB as referenced in Paragraph 18 above were shipped from UCB's location in Utah on or about May 20, 2019, and arrived in Antigua on May 27, 2019. Although it was contemplated by the parties and although it is customary in the industry, the Stem Cell Products were not accompanied by documentation of the technical details of the Stem Cell Products.

20.    The Stem Cell Products ordered by IIC from UCB as referenced in Paragraph 18 were scheduled for use by IIC for human implementation at the Center on or about May 29, 2019. Certain UCB personnel, including UCB Chairman Leigh Kimball, were on hand on May 29, 2019, at the Center in Antigua to assist with the use of the Stem Cell Products.

21.    Prior to the Center's use of the Stem Cell Products, in a May 29, 2019, email, IIC questioned UCB about the missing documentation. This email raised a number of specific questions about the Stem Cell Products supplied by UCB. A copy of IIC's May 29, 2019, email is attached hereto and incorporated herein as **Exhibit B**.

22.    There was no written response to IIC's May 29, 2019, email (i.e., Exhibit B). However, at a meeting held at the Clinic on May 29, 2019, **before** the implementation of the Stem Cell Products in human patients commenced, UCB Chairman Kimball told all persons in attendance at the Center who are to receive injections of the UCB Stem Cell Products that the failure to include documentation was an extraordinary oversight. UCB Chairman Kimball further expressly assured everyone at this meeting that the Stem Cell Products are in accordance with the specifications and

requirements of the Supply Contract. Based upon these representations by UCB, IIC proceeded with the use of the Stem Cell Products in implantation procedures at the Center.

23.     The statements by UCB Board Chairman Kimball as set forth in Paragraph 22 above were statements of material fact made by UCB with the intent that IIC would rely upon them, and IIC did reasonably rely upon these statements to its detriment. These statements were knowingly and materially false when made, were made with the intent to mislead IIC as to the true nature of the UCB Stem Cell Products, and as set forth herein, IIC has been damaged as a result of these false representations.

24.     Discussions about the missing documentation continued until the next day. As these discussions continued, on May 30, 2019, UCB Chairman Kimball conceded to IIC personnel that the Stem Cell Products shipped by UCB to Antigua probably did not meet the requirements of the Supply Contract, but he promised to return to Utah and send IIC the paperwork addressing the questions asked in IIC's May 29, 2019 email (i.e., Exhibit B).

25.     Again on June 1, 2019, UCB Chairman Kimball assured IIC personnel that UCB would send the documentation requested, and would restore IIC's confidence the following week.

26.     Again on June 2, 2019, by email, UCB Chairman Kimball again reassured IIC, stating, "On Monday, I will retrieve the paperwork for you. Got back in town and ready to work on your behalf. Talk via email Monday." A copy of Kimball's June 2, 2019, email is attached hereto and incorporated herein as **Exhibit C**.

27.     In a complete reversal of attitude and without legal justification, on June 3, 2019, UCB acting through UCB Chairman Kimball attempted by email to unilaterally cancel the Supply

-6-

Contract by email. A copy of Kimball's June 3, 2019, email is attached hereto and incorporated herein as **Exhibit D**.

28.     At the time the Exhibit D email was sent to IIC, UCB was in breach of the Supply Contract and had no legal right to terminate the Supply Contract or otherwise attempt to abrogate its legal obligations to IIC under the Supply Contract or applicable law. UCB's attempted cancellation of the Supply Contract was an anticipatory repudiation of UCB's obligations under the Supply Contract, and was a further breach of the Supply Contract.

29.     On June 17, 2019, after repeated promises, UCB finally semt to IIC certain documentation with respect to the UCB Stem Cell Products shipped to IIC back in May 2019. The documentation, however, did not contain all of the information required by the Supply Contract or requested by IIC's May 29, 2019 email (i.e., Exhibit B) and was deemed inadequate by IIC.

30.     In response to the receipt of the deficient documentation, on June 17, 2019, IIC notified UCB that the documentation was deficient and had to be corrected. IIC also demanded that UCB return the $25,000 paid for the May 2019 shipment. Return of the $25,000 is legally required and appropriate since the UCB Stem Cell Products contained in the May 2019 shipment did not meet the specifications of the Supply Contract (as conceded by UCB).

31.     As a direct and proximate cause of UCB's breach of contract, anticipatory repudiation, misrepresentation, and negligence, IIC has suffered damages, including liability for refunds to patients, damages related to the possibility of future litigation, lost profits, damages due to the delays that will occur due to IIC's need to locate a new supply due to UCB's anticipatory repudiation of the Supply Contract, loss to business reputation, and other damages as allowable under applicable law. While the amount of damages is still being determined, the amount of

-7-

damages are not less than the amount required for federal court jurisdiction in diversity of citizenship cases.

**COUNT I**
**Breach of Contract**
**(Including Anticipatory Repudiation)**

32.  IIC realleges and incorporates herein by reference all allegations set forth in Paragraphs 1 through 31 above.

33.  The Supply Contract is a valid and enforceable contract between IIC and UCB.

34.  IIC has fully performed all of its past and present obligations under the Supply Contract, and IIC's future obligations under the Supply Contract are excused due to UCB's anticipatory repudiation/anticipatory breach of the Supply Contract by UCB's attempted cancellation as discussed above.

35.  As discussed in more detail above, UCB has materially breached the Supply Contract and has failed to fully perform without legal excuse or justification.

36.  Additionally, due to UCB's attempted cancellation of the Supply Contract as discussed above, UCB has committed an anticipatory repudiation (also known as an anticipatory breach) of the Supply Contract.

37.  As a direct and proximate cause of UCB's breach of contract and anticipatory repudiation/anticipatory breach, IIC has suffered damages, including liability for refunds to patients, damages related to the possibility of future litigation, lost profits, damages due to the delays that will occur due to IIC's need to locate a new supply due to UCB's anticipatory repudiation of the Supply Contract, loss to business reputation, and other damages as allowable under applicable law. While the amount of damages is still being determined, the amount of damages are not less than the amount

required for federal court jurisdiction in diversity of citizenship cases. IIC is entitled to judgment against UCB in an appropriate amount as determined by the trier of fact.

### COUNT II
### Fraud and Misrepresentation

38.     IIC realleges and incorporates herein by reference all allegations set forth in Paragraphs 1 through 37 above.

39.     As more fully set forth above, UCB made certain false representations of material fact, including without limitation that the UCB Stem Cell Products shipped to IIC in May 2019 were in compliance with the specifications and requirements imposed by the Supply Contract.

40.     UCB knew that these representations were false when made or that there was insufficient evidence available to UCB at that time upon which to make the representations.

41.     UCB intended to induce action or inaction by IIC in reliance upon the representations, including without limitation the use of the UCB Stem Cell Products on human patients.

42.     IIC justifiably relied on the representations and acted in reliance of the representations when it proceeded to use the UCB Stem Cell Products on human patients.

43.     As a direct and proximate cause of UCB's fraud and misrepresentation, IIC has suffered damages, including liability for refunds to patients, damages related to the possibility of future litigation, lost profits, damages due to the delays that will occur due to IIC's need to locate a new supply due to UCB's anticipatory repudiation of the Supply Contract, loss to business reputation, and other damages as allowable under applicable law. While the amount of damages is still being determined, the amount of damages are not less than the amount required for federal court

jurisdiction in diversity of citizenship cases. IIC is entitled to judgment against UCB in an appropriate amount as determined by the trier of fact.

44.     UCB's misrepresentations were knowingly and wilfully made without due regard to the consequences of these actions. Accordingly, IIC is entitled to an award of punitive damages against UCB in an appropriate amount as determined by the trier of fact as is necessary to punish UCB for its wrongful actions and to deter those similarly situated from engaging in similar conduct in the future.

## COUNT III
### Negligence

45.     IIC realleges and incorporates herein by reference all allegations set forth in Paragraphs 1 through 44 above.

46.     UCB had the legal duty to IIC to perform the Supply Contract by undertaking all reasonable steps to ensure that the UCB Stem Cell Products being supplied to IIC were consistent with the specifications and requirements imposed by the Supply Contract, particularly since these Stem Cell Products were expressly contracted for use on human patients.

47.     Through its negligence (and perhaps its intentional actions and inactions), UCB breached this duty owed to IIC.

48.     UCB's breach of its duty owed to IIC was the direct and proximate cause of IIC's damages and injuries.

49.     Specifically, as a direct and proximate cause of UCB's negligence, IIC has suffered damages, including liability for refunds to patients, damages related to the possibility of future litigation, lost profits, damages due to the delays that will occur due to IIC's need to locate a new

-10-

supply due to UCB's anticipatory repudiation of the Supply Contract, loss to business reputation, and other damages as allowable under applicable law. While the amount of damages is still being determined, the amount of damages are not less than the amount required for federal court jurisdiction in diversity of citizenship cases. IIC is entitled to judgment against UCB in an appropriate amount as determined by the trier of fact.

## COUNT IV
### Mandatory Injunction

50. IIC realleges and incorporates herein by reference all allegations set forth in Paragraphs 1 through 49 above.

51. Under applicable law, a court may grant to a plaintiff mandatory injunctive relief in compelling circumstances and/or in situations involving extreme, great, or urgent necessity, and where adequate redress at law is not afforded, or where the injury is not compensable in damages. As set forth herein, the circumstances of this situation compel the granting to Plaintiff IIC of mandatory injunctive relief against Defendant UCB.

52. Under the Supply Contract, UCB was required to deliver to IIC Stem Cell Products which met certain minimum specification or requirements.

53. As specifically reflected in the Supply Contract, UCB was aware that the Stem Cell Products that it was supplying to IIC was for the treatment of human patients.

54. Based upon UCB's representations that the UCB Stem Cell Products shipped to IIC in May 2019 were in compliance with the minimum specifications or requirements imposed by the Supply Contract, IIC proceeded to use these UCB Stem Cell Products in its treatment of human patients.

55. Since the time of UCB's representations and IIC's subsequent use of the Stem Cell Products for treatment of human patients, UCB has informed IIC that the UCB Stem Cell Products did not meet the minimum specifications or requirements imposed under the Supply Contract.

56. IIC has repeatedly demanded that UCB furnish to it the full documentation of these Stem Cell Products, including numerous oral and written demands by IIC, including without limitation IIC's May 29, 2019 email (i.e., Exhibit B).

57. Despite assurances that such information would be forthcoming, UCB has wholly and completely failed to supply the required documentation relative to these Stem Cell Products.

58. This Court should enter a mandatory injunction against UCB requiring it to promptly compile and deliver to IIC (at UCB's cost) the full documentation of the UCB Stem Cell Products shipped to IIC in May 2019, and specifically including the information requested by IIC's May 29, 2019 email (i.e., Exhibit B). The need for this information is particularly urgent and compelling since these Stem Cell Products were used in the treatment of human patients.

59. IIC has no other way of obtaining this documentation and information. Accordingly, Plaintiff IIC has no adequate remedy at law.

## Attorney's Fees Request

60. Pursuant to Ark. Code Ann. § 16-66-208 and other applicable Arkansas law, the Plaintiff is entitled to the allowance of reasonable attorneys' fees in connection with this action.

## Reservation of Rights

61. Plaintiff reserves its right to plead further after additional investigation and discovery, including, but not limited to, the filing of one or more amended complaints, the addition of additional defendants, and any other matter permitted by applicable law.

-12-

**WHEREFORE,** Plaintiff, IIC Management Company, Ltd., requests entry of judgment against Defendant, Utah Cord Bank, Inc., in an appropriate amount of actual and punitive damages as determined by the trier of fact (with the amount of such damages alleged to be not less than the amount required for federal court jurisdiction in diversity of citizenship cases), pre-judgment and post-judgment interest until fully paid, for its costs herein expended, including reasonable attorneys' fees, and for all other proper relief to which it is entitled.

Respectfully submitted,

**HOPKINS CASTSTEEL PLC**
1000 West Second Street
Little Rock, Arkansas 72201
www.hopkinslawfirm.com
Telephone: (501) 375-1517
Facsimile: (501) 375-0231
Email: ghopkins@hopkinslawfirm.com

By:      /s/ Gregory M. Hopkins
**Gregory M. Hopkins**
Ark. Bar No. 81093

*Attorneys for* Plaintiff, IIC Management Company, Ltd.

-13-

DocuSign Envelope ID: 85BDBFFF-E847-43B4-8919-6DD4EF3665F7

## AGREEMENT

This Agreement is made effective April 17, 2019, between Utah Cord Bank, 8675 S. Sandy Pkwy, Ste. 110, Sandy, UT 84070 USA ("UCB") and IIC Management Company (Antigua), Ltd., a company formed in Antigua, with its principal office address at the Chambers of Radford Hill, Long Street, St. Johns, Antigua ("IIC").

WHEREAS, IIC is planning to open and operate a stem cell treatment center ("Center") in Antigua in May, 2019; and,

WHEREAS, UCB has developed for sale two stem cell products called StemVive and Stem ii ("Stem Cell Products"); and,

WHEREAS, IIC would like to purchase the Stem Cell Products from UCB for the use in treatment of its patients in the Center; and,

WHEREAS, IIC plans to build out a clean room ("Clean Room") within the next three months where it plans to develop and manufacture stem cell products for use in treatment of its patients in the Center; and,

WHEREAS, UCB has expertise in developing and manufacturing stem cell products; and,

WHEREAS, IIC would like to hire UCB to assist in setting up and staffing the Clean Room.

NOW THEREFORE, the parties agree to the following:

### Product Purchases

1. UCB agrees to sell to IIC both its Stem Cell Products for USD $250.00 per 1cc of product. Each 1cc will have a minimum of 80 million stem cells with a miinimum of live cell viability of 70%. UCB shall be IIC's primary supplier.

2. IIC agrees that each order for Stem Cell Products given to UCB will be for not less than 100ccs for a total of USD$25,000.00, payable within 15 days of receipt by wire transfer. However, the first order placed shall be paid in advance of shipment.

3. IIL further agrees that it will purchase not less than $100,000 of Stem Cell Products from UCB during the calendar years 2019 and 2020. It is IIC's intent to make UCB its primary supplier during the period 2019 and 2020.



DocuSign Envelope ID: 85BDBFFF-E847-43B4-8919-6DD4EF3665F7

4. UCB agrees that it will pay the shipping and transportation costs to deliver its products to IIC in Antigua. However, it shall be IIC's responsibility to bring the products through Antigua customs and to pay all customs duties and fees once the products have arrived inAntigua.

5. IIC shall have the right to renew the purchase agreement for 2020 with the same prices, minimum orders, and minimum annual purchase, except that for 2020 the minimum total purchases will be USD$200,000.

## Consulting

6. UCB agrees to assist IIC in staffing and training future IIC personnel to create stem cell products in IIC's lab in Antigua which should be completed and operational in three months. UCB shall hire and train at least two scientists in Utah for a minimum of three months who shall work at UCB's lab performing work and services for UCB during that three month period but all costs associated with the hiring and training of these scientists shall be reimbursed by IIC after the scientists relocate to Antigua for the purpose of entering into two-year employment contracts with IIC.

7. UCB also agrees to send Dr. Eliott Spencer and his wife to Antigua for one week to oversee the operation of the Clean Room and the development of stem cells one week after the Clean Room opens. IIC agrees to reimburse UCB for all costs related to Dr. Spencer and his wife's travel to Antigua.

8. In addition, Dr. Spencer and his wife will be available for consultation until December 31, 2019, by telephone, Skype, or other Internet communication.

9. In addition, to reimburse UCB for all its costs, IIC agrees to pay UCB USD$100,000 for its consulting expertise through December 31, 2019.

## Miscellaneous

10. At all times, UCB will perform its processing of fractionated biologic materials in Antigua to the standards set forth by the FDA, even though the FDA has no oversight or regulation of UCB's activities in Antigua. Likewise, international standards for manufacturing will be adhered to by UCB (e.g., AATB, cGMP, etc.).

DocuSign Envelope ID: 85BDBFFF-E847-43B4-8919-6DD4EF3665F7

11.    IIC intends to consistently report to UCB the results of patients treated in Antigua with the Stem Cell Products. This physician-reported-outcome-measures ("PROM") will facilitate UCB's development and refinement of new therapeutics which shall be made available to IIC on prices and terms to be agreed upon at that time.

12.    No product made by UCB or IIC may be exported to the USA by IIC nor will IIC re-sell UCB products to any third party. The sole intention is for IIC to purchase the Stem Cell Products for treatment of IIC's patients in Antigua.

13.    The parties are entering this agreement on the belief that both parties will operate in good faith toward each other.

## Acknowledgment

Acknowledged by the signatures below, all of the aforementioned is agreed to by UCB and IIC:

UTAH CORD BANK, INC.:                    IIC MANAGEMENT CO. (ANTIGUA), LTD.:

DocuSigned by:                           DocuSigned by:
*Eliott Spencer*                          *Dr. Bruce Murphy*
797A0E7AA92744E...                        957BA0D285C5454...

Dr. Eliott Spencer, Ph.D.                Dr. Bruce Murphy, MD, Chairman


4/17/2019                                4/18/2019

Date                                     Date

## Re: Official Order Email

paul internationalinvestmentsltd.com

Wed 5/29/2019 7:16 AM

To: Leigh Kimball <lkimball@utcb.us>
Cc: Dr. Bruce Murphy <bruce.murphy@arheart.com>; Eliott Spencer <admin@utcb.us>
Bcc Robin Rodriguez <robin.rodriguez@sovereignbank.lc>; Tom Thomas <tabraham.thomas@yahoo.com>; greg internationalinvestmentsltd.com <greg@internationalinvestmentsltd.com>; terri internationalinvestmentsltd.com <terri@internationalinvestmentsltd.com>; Scott Rohleder <scott@danbilzerian.com>; Dan Bilzerian <dan@danbilzerian.com>; Adam Bilzerian <adam@leanstaffing.com>; Pradeep Albert <winrad@yahoo.com>; Orlando Florete Jr <oflorete@gmail.com>; Andrea Nelson <andrea.nelson@arheart.com>

Leigh, as you can see from the order below, we received 34cc of Stemii and 66cc of StemVive. What is not disclosed are the following which we have had numerous people ask yesterday:

1. How many msg stem cells are in each 1cc vial?
2. How many of those are live?
3. What other cells are contained in each vial?
4. Where did the stem cells come from?
5. Where is the detailed information on each vial that shows from whom they were obtained, when, and where?
6. When did UTCB test them and where are the test results?

We would be grateful for immediate answers today before the start of our meeting at 9:00 am. Thank you.



**From:** Leigh Kimball <lkimball@utcb.us>
**Sent:** Sunday, June 2, 2019 5:01 PM
**To:** paul internationalinvestmentsltd.com
**Subject:** Re: Paperwork and Test Results

On Monday, I will retrieve the paperwork for you. Got back in town and ready to work on your behalf. Talk via email Monday



From: Leigh Kimball <lkimball@utcb.us>
Sent: Monday, June 3, 2019 3:43 PM
To: paul internationalinvestmentsltd.com; Dr. Bruce Murphy
Subject: Agreement Cancellation

Last month, UCB sent Dr. Murphy an Addendum to the Agreement, which was never executed. When I was going to fly to Little Rock to get the deal signed, he begged off due to a scheduling conflict.

As as result of the confab in Antigua, it is clear that your organization is intent on finding another resource for stem cells to be expanded in your facility in St. John's. I wish you well in that endeavor.

This notice hereby cancels the Agreement.

We wish you the best with the Caribbean clinic, including your quest at Hodges Bay.

--
Leigh Kimball
Chief Executive Officer
Utah Cord Bank, Inc.
(888) 295-1093, ext. 4283
c: 702-501-1001

